**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JENNIFER DAVENPORT, in her official capacity as Attorney General of New Jersey
25 Market Street
Trenton, NJ 08625; and

YOLANDA N. MELVILLE, in her official capacity as Director of the New Jersey Division on Civil Rights
31 Clinton Street
Newark, NJ 07102,

*Plaintiffs*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY
2707 Martin Luther King Jr Ave SE
Washington, DC 20528-0525;

MARKWAYNE MULLIN, in his official capacity as the Secretary of the U.S. Department of Homeland Security
Office of the Executive Secretary
MS 0525 Department of Homeland Security
2707 Martin Luther King Jr Ave SE
Washington, DC 20528-0525;

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
500 12th St., SW
Washington, DC 20024; and

DAVID J. VENTURELLA, in his official capacity as the Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement
500 12th St., SW
Washington, DC 20024,

*Defendants*.

Case No. ______

# COMPLAINT

1. This case concerns the Federal Government's continued stonewalling of the New Jersey Attorney General's investigation into a serious and troubling pattern of alleged civil rights violations by The GEO Group, Inc. ("GEO Group"), a private federal contractor that owns and operates Delaney Hall, an immigration-detention facility in Newark, New Jersey.

2. In February 2025, the U.S. Department of Homeland Security ("DHS"), through Immigration and Customs Enforcement ("ICE"), contracted with GEO Group to re-open Delaney Hall, a then-vacant facility owned by GEO Group, as a 1,000-bed federal immigration detention center.

3. Since its re-opening, at least three people have died while in GEO Group's custody, raising serious questions about the adequacy of medical care provided by GEO Group to detainees at the facility. One person died less than 24 hours after arriving at Delaney Hall; an internal review found that medical personnel at the facility failed to recognize his symptoms as indicative of cardiac arrest and failed to render what could have been life-saving treatment. Another died within four days of arriving at Delaney Hall after experiencing seizure-like activity. And a third person died from cardiac arrest, reportedly after he was denied access to his routine medications for diabetes, seizure control, and high blood pressure. That person reportedly complained of one-sided numbness or paralysis the day before he died, but he was not taken to the hospital until after he experienced cardiac arrest.

4. Six days after the third death in GEO Group's care, Plaintiffs—New Jersey Attorney General Jennifer Davenport and New Jersey Division on Civil Rights Director Yolanda N. Melville—announced that they had opened an investigation into potential violations of detainees' civil and constitutional rights, including the constitutional right to medical care while

in custody, under the New Jersey Civil Rights Act ("CRA"), as well as violations of the New Jersey Law Against Discrimination ("LAD").

5. Multiple reports suggest that the fatalities at Delaney Hall reflect a broader failure by GEO Group to maintain many basic standards of human care. One detainee reportedly told a U.S. Senator that, after having a miscarriage, she received no care whatsoever and was left to manage the miscarriage alone. Reports have also indicated that communicable diseases like the flu and COVID-19 have rapidly spread among the detainee population; that detainees have been served raw meat, vegetables containing worms, or fully frozen food; and that staff fails to protect detainees from sexual abuse. Reports from detainees, together with other records obtained by the New Jersey Division on Civil Rights, also suggest that detainees are regularly denied critical medication while in GEO Group's custody.

6. The potential civil rights violations at Delaney Hall go even further. Detainees report being subjected to indiscriminate and disproportionate use of force by Delaney Hall guards. Individuals with disabilities report being denied reasonable accommodations, making daily life in detention even more difficult. And detainees report being denied language interpretation even when making decisions that have life-altering stakes.

7. For months, however, state and local officials seeking critical information about the facility have been stonewalled. For instance, GEO Group—in coordination with DHS—prevented Newark officials from inspecting the facility to ensure that it met municipal safety codes; barred state health inspectors from ensuring that the building's housing and medical units met basic sanitation and livability standards; denied New Jersey's Governor the opportunity to speak with detainees on a tour she described as "closely controlled and limited"; and refused to meaningfully cooperate with attempts by other governmental entities to ensure that the conditions of detention

meet basic standards of human dignity and safety. In response, the City of Newark and the New Jersey Health Commissioner filed lawsuits to obtain access to Delaney Hall and information about its treatment of detainees.

8. This present suit challenges Defendants' attempt to obstruct efforts by state officials to obtain information about whether the treatment of detainees complies with all applicable civil rights laws and constitutional protections.

9. On August 7, 2026, pursuant to their authority under New Jersey law, Plaintiffs issued a subpoena to GEO Group seeking information regarding the provision of medical treatment to detainees at Delaney Hall. Despite being a private corporation doing business in New Jersey and operating Delaney Hall on property it owns within New Jersey, GEO Group refused to comply with the subpoena, claiming that it would need authorization from DHS under DHS's internal housekeeping regulations (informally known as "*Touhy* regulations"). *See* 6 C.F.R. §§ 5.41–5.49. GEO Group claimed that, pursuant to those regulations, it had promptly forwarded the subpoena to DHS's General Counsel to determine whether to authorize GEO Group to respond to Plaintiffs' requests.

10. Though Plaintiffs have never conceded that *Touhy* regulations provide a valid basis for GEO Group to ignore a state subpoena regarding well-founded allegations of civil-rights violations occurring on private property within New Jersey's borders, Plaintiffs have nevertheless, in the ensuing three months, repeatedly asked DHS in the alternative to authorize GEO Group to produce the documents. In doing so, Plaintiffs have underscored the critical and time-sensitive need for the documents as part of the State's investigation. These repeated inquiries have been met with silence. Not only has DHS failed to authorize the production of any information, but it has

refused even to confirm whether it will or will not authorize GEO Group to produce responsive material.

11. Defendants' months-long delay and refusal to respond comes at an extraordinarily high cost. Already three detainees at Delaney Hall have died. Additional detainees are at substantial risk of becoming sick or dying because of Delaney Hall's reportedly sub-standard conditions. Plaintiffs are responsible for securing and vindicating the civil rights of people within New Jersey's borders—as the people held at Delaney Hall, owned and operated by a private company, undeniably are. They cannot wait for months on end for Defendants' response while Defendants delay and refuse to decide how they will answer Plaintiffs' request.

12. Accordingly, Plaintiffs ask this Court to find that Defendants' response to Plaintiffs' *Touhy* request is unlawfully withheld and unreasonably delayed under the Administrative Procedure Act ("APA"), and to establish a date certain by which Defendants must decide whether to authorize GEO Group to respond to Plaintiffs' requests.

## JURISDICTION AND VENUE

13. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346. This Court has authority to grant declaratory, injunctive, and other relief pursuant to 5 U.S.C. §§ 702, 705, and 706.

14. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1) because defendants "reside" in this district and a "substantial part" of the conduct underlying this Complaint occurred within this district. Consistent with DHS regulations, Plaintiffs' subpoena was sent to Defendants, who are all located in this district, to decide whether to authorize compliance with the subpoena.

## PARTIES

**A. Plaintiffs**

15. Jennifer Davenport is the Attorney General of New Jersey, the State's chief law enforcement officer, and is authorized to issue subpoenas and to seek information relating to violations of the law under the CRA and the LAD. *See, e.g.*, N.J. Stat. Ann. §§ 10:5-8 and -8.2. She brings this suit in her official capacity.

16. Plaintiff Yolanda N. Melville is the Director of the New Jersey Division on Civil Rights ("DCR"), an agency within the New Jersey Office of the Attorney General, and is authorized to issue subpoenas and to generally seek information relating to violations of the law under the CRA and the LAD. *See, e.g.*, N.J. Stat. Ann. §§ 10:5-8 and -8.2. She brings this suit in her official capacity.

**B. Defendants**

17. Defendant U.S. Department of Homeland Security is an agency and executive department of the United States government that oversees immigration detention.

18. Defendant Markwayne Mullin is the Secretary of DHS and is thus the official responsible for the Department's activities. He is sued in his official capacity.

19. Defendant U.S. Immigration and Customs Enforcement is the federal agency within DHS that manages immigration detention.

20. Defendant David J. Venturella is the Senior Official Performing the Duties of the Director at ICE and is thus the official responsible for the agency's activities. He is sued in his official capacity.

# ALLEGATIONS

## I. Legal Background

### A. The Federal Housekeeping Statute And *Touhy* Regulations

21. 5 U.S.C. § 301 (the federal "Housekeeping Statute") authorizes the "head of an Executive department" to "prescribe regulations for the government of his [or her] department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property." The Supreme Court, in *United States ex rel. Touhy v. Ragen*, explained that executive agencies may promulgate regulations "centralizing determination[s] as to whether subpoenas … will be willingly obeyed or challenged." 340 U.S. 462, 468 (1951). Accordingly, when a party seeks to obtain information from a federal employee or agency via a subpoena or other form of request, the procedure usually follows the relevant agency's internal housekeeping regulations, colloquially known as "*Touhy* regulations."

22. The Housekeeping Statute states that it "does not authorize withholding information from the public or limiting the availability of records to the public." 5 U.S.C. § 301. Accordingly, neither the statute, the *Touhy* decision, nor the *Touhy* regulations that agencies promulgate pursuant to the statute "authorize[] a federal agency to withhold documents," and any claim "to the contrary … exceeds [agency] authority under the Housekeeping Statute." *Hou. Bus. J. v. Off. of Comptroller of Currency*, 86 F.3d 1208, 1212 (D.C. Cir. 1996).

23. Instead, to the extent the Federal Government has authority not to comply with a valid state subpoena in state court, that authority derives from the Federal Government's sovereign immunity. *See id.* at 1211–12 ("In state court the federal government is shielded by sovereign immunity, which prevents the state court from enforcing a subpoena."); *see also COMSAT Corp. v. Nat'l Sci. Found.*, 190 F.3d 269, 277 (4th Cir. 1999) ("[I]t is sovereign immunity, not

housekeeping regulations, that gives rise to the Government's power to refuse compliance with a subpoena.").

24. An agency's *Touhy* regulations, by contrast, are merely a tool for "centralizing" consideration of requests for documents and information as well as subpoenas within the agency. *Yousuf v. Samantar*, 451 F.3d 248, 257 (D.C. Cir. 2006).

25. DHS's *Touhy* regulations are codified at 6 C.F.R. §§ 5.41–5.49. They set forth procedures to be followed where a "state … administrative authority" issues a "subpoena[] … or other request[] or demand[]" for information acquired by DHS's employees in the performance of their official duties. *Id.* § 5.41(a)(2).

26. GEO Group is a corporation that contracts to provide services to ICE.

27. As a contractor, GEO Group does not possess the Federal Government's sovereign immunity. *Hencely v. Fluor Corp.*, 608 U.S. 31, 47 (2026) ("[T]hose who contract to furnish supplies or render services to the government are not such agencies and do not perform governmental functions."); *GEO Grp., Inc. v. Menocal*, 607 U.S. 438, 449 (2026) ("[S]overeign immunity is not transferable to agents, including contractors, of a government.").

28. However, GEO Group has asserted that as a "contractor," it is a DHS "employee" subject to the agency's *Touhy* regulations. 6 C.F.R. § 5.41(c).

29. When an employee receives a subpoena or other request for information covered by DHS's *Touhy* regulations, that employee must "immediately forward a copy of that document to the Office of the [DHS] General Counsel." *Id.* § 5.43(b).

30. The General Counsel is the final authority within DHS as to the production of documents under its *Touhy* regulations. *See id.* § 5.44(b).

31. Upon receipt of a subpoena or other request for information, the General Counsel or their delegee must "notify the Department employee and such other persons as circumstances may warrant of its decision regarding compliance with the request or demand." *Id.* § 5.45(c).

32. DHS's *Touhy* regulations further provide that, "[i]n deciding whether to comply with a demand or request" submitted under the regulations, the General Counsel and their delegees shall consider, among any other pertinent considerations:

> (1) Whether such compliance would be unduly burdensome or otherwise inappropriate under the applicable rules of discovery or the rules of procedure governing the case or matter in which the demand arose;
>
> (2) Whether compliance is appropriate under the relevant substantive law concerning privilege or disclosure of information;
>
> (3) The public interest;
>
> (4) The need to conserve the time of Department employees for the conduct of official business;
>
> (5) The need to avoid spending the time and money of the United States for private purposes;
>
> (6) The need to maintain impartiality between private litigants in cases where a substantial government interest is not implicated;
>
> (7) Whether compliance would have an adverse effect on performance by the Department of its mission and duties; and
>
> (8) The need to avoid involving the Department in controversial issues not related to its mission.

*Id.* § 5.48.

33. Determinations by agencies pursuant to these regulations can be challenged under the APA. *See Hou. Bus. J.*, 86 F.3d at 1212.

**B. New Jersey's Subpoena Authority**

34. Both the CRA and the LAD provide Plaintiffs with broad authority during an investigation to obtain documents and information in the possession, custody, or control of corporations doing business in the State, such as GEO Group.

35. The CRA, N.J. Stat. Ann. §§ 10:6-1 to -2, and LAD, N.J. Stat. Ann. §§ 10:5-1 to -50, respectively, are longstanding and generally applicable state laws that do not single out immigration enforcement or those corporations that contract with the Federal Government.

36. The CRA was enacted in 2004 "for the broad purpose of assuring a state law cause of action for violations of state and federal constitutional rights and to fill any gaps in state statutory anti-discrimination protection." *Owens v. Feigin*, 947 A.2d 653, 655 (N.J. 2008). It provides a remedy for the violation of "substantive rights" secured by the Federal and New Jersey Constitutions and laws. *See Tumpson v. Farina*, 95 A.3d 210, 223 (N.J. 2014) (noting that "[b]y its very nature, the term [substantive right] is broad in its conception").

37. For people held in custody in places like Delaney Hall, those rights include, but are not limited to, the right to adequate medical care and the right to be kept reasonably safe from violence. *See*, *e.g.*, *Youngberg v. Romeo*, 457 U.S. 307, 317–20, 324 (1982); *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976); *E. D. v. Sharkey*, 928 F.3d 299, 306 (3d Cir. 2019); *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012).

38. The CRA authorizes the New Jersey Attorney General to affirmatively "bring a civil action for damages and for injunctive or other appropriate relief" in the "name of the State and … on behalf of [an] injured party" whenever "a person, whether or not acting under color of law," either deprives, interferes, or attempts to interfere with another's substantive rights, privileges, or immunities. N.J. Stat. Ann. § 10:6-2(a)-(b); *see also Perez v. Zagami, LLC*, 94 A.3d 869, 875 (N.J. 2014) ("The relevant legislative history, as well as the plain text of the statute,

establish that the Attorney General may bring suit against an individual 'whether or not [the defendant is] acting under color of law.'").

39. The LAD, one of the oldest civil rights laws in the nation, was enacted in 1945 to "eradicate[] … the cancer of discrimination." *See C.V. v. Waterford*, 300 A.3d 958, 968 (N.J. 2023). The LAD prohibits unlawful discrimination in places of public accommodation, including discrimination based on national origin, pregnancy, or disability. N.J. Stat. Ann. §§ 10:5-5(l), 10:5-12(f). The statute authorizes both the Attorney General and the DCR Director to take appropriate legal action to respond to and prevent unlawful discrimination. *See* N.J. Stat. Ann. §§ 10:5-8.2(b), 10:5-13(a)(2), 10:5-14.1.

40. The Attorney General and DCR Director are expressly authorized by statute to investigate potential CRA and LAD violations. Indeed, when it "appear[s]" to them that "a person has engaged in, is engaging in, or is about to engage in any practice declared to be unlawful by the [LAD] or the [CRA], or when" they "believe[] it to be in the public interest that an investigation should be made to ascertain whether a person in fact has engaged in, is engaging in, or is about to engage in, any such practice, the Attorney General or the [D]irector [of DCR] may conduct an investigation." N.J. Stat. Ann. § 10:5-8.2(a).

41. As part of such investigations, the Attorney General or Director of DCR "may utilize all investigative powers set forth in" N.J. Stat. Ann. § 10:5-8. N.J. Stat. Ann. § 10:5-8.2(a). These powers include "subpoena[ing] witnesses, compel[ling] their attendance, administer[ing] oaths, tak[ing] the testimony of any person … and, in connection therewith, requir[ing] the production for examination of any books or papers relating to any subject matter under investigation or in question by [DCR] and conduct[ing] such discovery procedures which may include the taking of interrogatories and oral depositions." N.J. Stat. Ann. § 10:5-8(i).

42. Plaintiffs are authorized to obtain orders directing a person to respond to a subpoena when a person does not comply with the subpoena. *See, e.g.*, N.J. Stat. Ann. §§ 10:5-8.2(b), 10:5-8(i), 10:5-14.1; N.J. Admin. Code § 13:4-4.6.

43. The CRA and LAD apply to a wide range of persons and entities operating in New Jersey. By their plain text, they apply without regard to whether a person or entity contracts with the Federal Government. Indeed, "[p]erson" is defined broadly under New Jersey law to include "corporations, companies, associations, societies, firms, partnerships and joint stock companies as well as individuals." N.J. Stat. Ann. § 1:1-2. And the LAD similarly defines "[p]erson" to include "one or more individuals, partnerships, associations, organizations, labor organizations, corporations," and other entities. N.J. Stat. Ann. § 10:5-5(a).

44. Plaintiffs are thus legally entitled to compliance with their subpoenas by corporations like GEO Group.

## II. Factual Background

### A. Substandard Conditions And Inadequate Medical Care At Delaney Hall

45. Delaney Hall is a facility located at 451 Doremus Avenue in Newark, New Jersey. From 2011 to 2017, it was operated by GEO Group, pursuant to a contract with DHS, as a federal immigration detention facility. In 2017, DHS ceased using the facility as an immigration detention center, and it was repurposed as a residential reentry center before being vacated entirely in 2023.

46. On February 26, 2025, ICE announced the re-opening of Delaney Hall as a 1,000-bed immigration detention facility. *See* Press Release, *ICE expands detention capacity with Delaney Hall Facility in New Jersey* (Feb. 26, 2025), https://www.ice.gov/news/releases/ice-expands-detention-capacity-delaney-hall-facility-new-jersey.

47. The next day, February 27, 2025, GEO Group announced that it had "been awarded a 15-year, fixed-price contract" by ICE "to provide support services for the establishment of a

federal immigration processing center at … Delaney Hall." *See* Press Release, *The GEO Group Awarded 15-Year Contract by U.S. Immigration and Customs Enforcement for Company-Owned, 1,000-Bed Delaney Hall Facility in New Jersey* (Feb. 27, 2025), https://investors.geogroup.com/news-releases/news-release-details/geo-group-awarded-15-year-contract-us-immigration-and-customs. GEO Group's contract included "the exclusive use" of the "company-owned" facility by ICE and various other GEO Group "support services"—specifically, the provision of "security, maintenance, and food services" and "access to recreational amenities, medical care, and legal counsel" for detainees. *Id.* GEO Group is expected to generate roughly $1 billion in profit from the operation of Delaney Hall. *Id.*

48. Delaney Hall began housing detainees on May 1, 2025, and allegations of sub-standard conditions arose almost immediately. Barely a month after Delaney Hall opened, the New York times reported that "[m]eals had been erratic," some detainees "were sleeping on floors," the water "was sometimes scalding or foul tasting," and the air conditioning sometimes did not work. Tracey Tully et al., *Inside the Tumult That Led 4 Men to Escape from a Migrant Facility*, THE NEW YORK TIMES (June 14, 2025), https://www.nytimes.com/2025/06/14/nyregion/newark-ice-detainees-escape.html. Detainees alerted their "lawyers and [] relatives about increasingly crammed quarters and paltry meals served at irregular hours." *Id.* Ultimately, the deteriorating conditions reportedly prompted an escape attempt that resulted in four detainees breaking through a wall and fleeing from the facility. *Id.*

49. A later-released report indicated that, in the aftermath of the escape attempt, officials sprayed gas on detainees to "discourage people from doing something," though "[t]he section of the report detailing what officials feared exactly is redacted." Zach Blackburn & Joey Fox, *ICE documents provide details on detainment statistics, June unrest at Delaney Hall*, N.J.

GLOBE (Sept. 2, 2025), https://newjerseyglobe.com/immigration/ice-documents-provide-details-on-detainment-statistics-june-unrest-at-delaney-hall/.

50. Reporting in September 2025 continued to support claims that detainees were being subjected to inhumane conditions. *See* Steve Janoski, *Inside New Jersey's troubled immigration detention center: 'It's designed to break people*,' JERSEY VINDICATOR (Sept. 25, 2025), https://jerseyvindicator.org/2025/09/25/inside-new-jerseys-troubled-immigration-detention-center-its-designed-to-break-people/. In addition to inedible food, foul and non-potable water, and lack of access to sufficient healthcare and medications, reports indicate that COVID-19 outbreaks wreaked havoc on detainees, but that guards would "only hand out Tylenol" in response and often required detainees with COVID-19 to sleep "in frigid rooms with a threadbare mattress and no pillow or blankets," without "any other kind of treatment." *Id.* And those "with potentially life-threatening health issues" had gone "for long periods without assistance." *Id.*

51. On December 12, 2025, Jean Wilson Brutus, a Delaney Hall detainee, died following what ICE described as a "medical emergency." Sophie Nieto-Munoz, *41-year-old detainee at Newark migrant jail died in custody, ICE says*, N.J. MONITOR (Dec. 19, 2025), https://newjerseymonitor.com/2025/12/19/ice-detainee-newark-jail-died/. ICE did not publicly report the death until a week later, on December 18, 2025. *Id.* Mr. Brutus's death occurred less than 24 hours after he arrived at the facility. *Id.* A custody officer observed that Mr. Brutus was in distress, and he was transported to University Hospital in Newark, where he was pronounced dead within an hour. *See id.*; ICE Enf't & Removal Operations, *ICE Detainee Death Report: BRUTUS, Jean Wilson*, https://www.ice.gov/doclib/foia/reports/ddrJeanWilsonBrutus.pdf (last visited Nov. 15, 2026); St. John Barned-Smith & Ko Lyn Cheang, *Exclusive: ICE investigated how dozens of detainees died. The findings are 'damning'*, S.F. CHRON. (Nov. 6, 2026),

https://www.sfchronicle.com/us-world/article/ice-detainee-medical-care-investigations-22495407.php. An ICE internal review of Mr. Brutus's death found that medical personnel responding to his distress failed to recognize his symptoms as indicative of cardiac arrest and failed to render what could have been life-saving treatment, and that Delaney Hall failed to have a defibrillator or oxygen tank nearby that could have aided Mr. Brutus. *Id.*

52. Two days later, on December 14, U.S. Senator Andy Kim visited Delaney Hall to conduct statutory oversight and "spoke to about 50 detainees who said they're not getting necessary medical treatment, appropriate clothing or food that's fit to eat." Steve Janoski, *Sen. Andy Kim renews call to close Delaney Hall as advocates decry worsening conditions and lack of heated shelter for visitors*, JERSEY VINDICATOR (Dec. 17, 2025), https://jerseyvindicator.org/2025/12/17/sen-andy-kim-renews-call-to-close-delaney-hall-as-advocates-decry-worsening-conditions-and-lack-of-heated-shelter-for-visitors/.

53. A week and a half later, on December 23, three Members of Congress went to Delaney Hall to conduct statutory oversight. Press Release, *Menendez, McIver, and Clarke Conduct Oversight Visit at Delaney Hall* (Dec. 23, 2025), https://menendez.house.gov/media/press-releases/menendez-mciver-and-clarke-conduct-oversight-visit-at-delaney-hall. The Members reported hearing from detainees that they "are not getting proper medical care." *Id.* One Member stated that "[n]o human being deserves to suffer the conditions we witnessed behind the walls of Delaney Hall." *Id.*

54. In early February 2026, roughly 25 detainees signed a hand-written letter outlining serious, ongoing issues at Delaney Hall. *See* Steve Janoski, *Detained immigrants issue "Our Cry," a letter from inside Newark ICE facility pleading for due process*, JERSEY VINDICATOR (Feb. 12, 2026), https://jerseyvindicator.org/2026/02/12/detained-immigrants-issue-our-cry-a-letter-from-

inside-newark-ice-facility-pleading-for-due-process/. The letter called the facility overcrowded and explained that the flu and other illnesses were constant and spread rapidly.

55. In May 2026, after months of protests and demonstrations outside the facility, around 300 Delaney Hall detainees "began a hunger and labor strike to bring attention" to their inhumane living conditions. Sophie Nieto-Munoz, *Newark migrant jail detainees launch hunger, labor strike over conditions behind bars*, N.J. MONITOR (May 22, 2026), https://newjerseymonitor.com/2026/05/22/delaney-hall-hunger-strike/. One detainee reportedly complained of problems with "racism, with bad conditions, with guards that do not help us." *Id.* Others "said they found live worms in their meals of beans and salad." *Id.*

56. In addition to the hunger strike, detainees released a second letter, this time signed by over 300 detainees, protesting the conditions in the facility. *Id.* The letter describes the conditions within the facility as torturous, specifically noting the poor food, the spread of COVID-19, and a flu outbreak. *See id.*; *see also S.O.S: A Second Letter From Delaney Hall*, https://www.lahuelga.com/sos (last visited Nov. 15, 2026).

57. A third letter followed soon after, reiterating the presence of worms in detainees' food, the health threats posed by the spread of communicable diseases, inadequate healthcare, and the lack of emergency protocols when emergencies do occur. Rodrigo Torrejón, *Delaney Hall Detainees Release 3rd Letter After Hunger Strike, Protests*, ESSEX LOCAL (May 26, 2026), https://montclairlocal.news/2026/05/delaney-hall-detainees-release-3rd-letter-after-hunger-strike-protests/; *see also Don't Give Up: A Letter From Delaney Hall* (May 26, 2026), https://www.lahuelga.com/comunicado.

58. On May 26, 2026, U.S. Senator Andy Kim reported meeting with a detainee who communicated that "she suffered a miscarriage and did not receive the care she needed and was

left to manage that on her own." *Protesters clash with ICE agents outside Delaney Hall amid hunger strike*, ABC7 EYEWITNESS NEWS (May 26, 2026), https://abc7ny.com/post/protesters-clash-ice-agents-outside-delaney-hall-amid-hunger-strike-2-lawmakers-visit-scene/19166948/.

59. Three days later, on May 28, after a confrontation between detainees and GEO guards, guards beat and pepper sprayed detainees, including detainees with medical conditions. Sophie Nieto-Munoz, *Migrant Detainees Separated From Loved Ones Amid Clashes Between ICE Agents, Protesters*, N.J. MONITOR (May 28, 2016, at 11:42 PM ET), https://newjerseymonitor.com/2026/05/28/migrant-jail-detainees-separated-from-loved-ones-amid-clashes-between-ice-agents-protesters/. Detainees reportedly suffered a variety of injuries, including a fractured hand, a head injury, and an abnormal EKG, and reported that they experienced difficulty breathing and eye irritation. Four ambulances left the facility to take detainees to University Hospital that day. *Id.*; *see also* Nichole Zanchelli, *Delaney Hall Detainees Demanding Immediate Doctor Evaluation After Tear Gassing, Beatings By Guards, Advocates Say*, TAPINTO NEWARK (May 29, 2026, at 7:00 PM ET), https://www.tapinto.net/towns/newark/sections/law-and-justice/articles/delaney-hall-detainees-demanding-immediate-doctor-evaluation-after-tear-gassing-beatings-by-guards-advocates-say.

60. That same day, inspectors from the New Jersey Department of Health were permitted access only to Delaney Hall's kitchen, where they identified a number of safety violations, including food that had been cooled improperly, cooked meat that was stored at temperatures inadequate to kill harmful bacteria, and beverages located next to dangerous chemicals. Ana Ley et al., *Contaminated Food, Unwashed Hands: Inside an ICE Detention Facility*, N.Y. TIMES (July 16, 2026), https://www.nytimes.com/2026/07/10/nyregion/delaney-hall-ice-conditions-unsanitary.html.

61. During that time, a New Jersey public health official also received a complaint from a physician about a detainee with "an active case of tuberculosis." *Id.* That detainee had been treated at University Hospital, but was then taken back to Delaney Hall "with no follow-up plan to contain the infection." *Id.*

62. In late July 2026, a second detainee—Jose Chajon-Raxon—died while in GEO Group's custody. *See* Ana Ley & Pranav Baskar, *A Third Immigrant Detained at Delaney Hall Dies After Medical Emergency*, N.Y. TIMES (Aug. 12, 2026), https://www.nytimes.com/2026/08/12/nyregion/delaney-hall-immigrant-death.html. Upon information and belief, Mr. Chajon-Raxon suffered multiple seizures shortly after he was first taken to Delaney Hall on July 18, 2026. ICE did not publicly report Mr. Chajon-Raxon's death for several weeks.

63. On August 1, 2026, ICE reported the death of a third Delaney Hall detainee: 41-year-old Edwin Lopez-Cornejo. *See* David Wildstein, *Sherrill, N.J. lawmakers demand answers after Delaney Hall detainee dies*, N.J. GLOBE (Aug. 3, 2026, at 10:06 PM ET), https://newjerseyglobe.com/immigration/sherrill-n-j-lawmakers-demand-answers-after-delaney-hall-detainee-dies/. Mr. Lopez-Cornejo's family asserts that he "had diabetes and high blood pressure and was not provided with prescribed medication during the rough[ly] six weeks he was detained." *Id.* His family also asserts that he "complained of numbness in his face and hand" the day before he died. Sophie Nieto-Munoz, *Mom 'heartbroken' over death of son detained at migrant jail Delaney Hall*, N.J. MONITOR (Aug. 3, 2026, at 8:05 PM ET), https://newjerseymonitor.com/2026/08/03/immigrant-dies-dies-delaney-hall/.

64. Plaintiffs have received additional reports and identified other evidence supporting the serious and troubling concerns that have been publicly reported. Plaintiffs are aware of numerous reports indicating that GEO's provision of medical care to detainees at Delaney Hall is

plagued by serious deficiencies, including inadequate medical intake and screening of detainees, failing to provide detainees with needed medications for chronic conditions, responding inadequately to medical crises, and failing to provide necessary care to detainees in its custody. Indeed, in addition to the three deaths of detainees, upon information and belief, hundreds of additional detainees have needed to obtain emergency medical care at University Hospital due to the acute deterioration of their health while in detention at Delaney Hall.

65. Multiple reports indicate that GEO Group also has failed to protect detainees from physical harm. For example, in July 2026, Hieison Ultengo, a 37-year-old asylum seeker from Colombia who was formerly detained at Delaney Hall, alleged that another male detainee raped him while he was housed there on June 25, 2026. *See* Michael Sol Warren, *Attorney Says Newark immigrant center detainee was raped, then transferred 2 days later*, GOTHAMIST (July 7, 2026), https://gothamist.com/news/attorney-says-newark-immigrant-center-detainee-was-raped-then-transferred-2-days-later. Two days after the alleged assault occurred, ICE reportedly transferred Mr. Ultengo to a correctional center in Mississippi without explanation. *Id.* Plaintiffs are also aware of reports that one GEO employee has been accused of sexually assaulting multiple female detainees and that GEO has failed to prevent its employees from using excessive force against detainees.

66. Evidence reviewed by Plaintiffs also raises concerns that individuals with disabilities have been denied accommodations necessary for their physical safety and that detainees are routinely denied access to language interpretation, including for medical intakes or when signing forms for their immigration cases.

67. ICE's own internal oversight corroborates these accounts. ICE performed an internal review of the conditions at Delaney Hall and identified 22 "deficiencies" with the facility's

compliance with applicable detention standards. ICE Off. of Pro. Resp., *Delaney Hall Detention Facility*, *Inspection 2026-001-148, Sept. 15-17*, 5 (2026), https://www.ice.gov/doclib/foia/odo-compliance-inspections/DelaneyHallDetFacComplianceInsFinalReport_09172026.pdf. The report, authored by ICE's Office of Professional Responsibility, Office of Detention Oversight (ODO), reflects the results of an inspection of Delaney Hall conducted from September 15-17, 2026. The review identified six deficiencies regarding the facility's compliance with requirements related to "sexual abuse and assault prevention and intervention." *Id.* at 4. The report notes that one detainee told staff that she was sexually assaulted by an officer; yet ODO concluded without any explanation that these allegations were "unfounded." *Id.* at 7. The report also identified deficiencies in GEO's provision of appropriate medical care and prescribed medication, as well as deficiencies in GEO's completion of initial physical and mental health screenings for new individuals brought to the facility. *Id.* at 11–12. Several individuals reported to ODO that they were unable to access appropriate medical care, including being unable to get necessary medication in a timely manner. *Id.* at 6–7.

**B. The Facility's Attempts To Prevent Health And Safety Inspections**

68. Since before Delaney Hall housed its first detainee, the facility has resisted any attempt by state or local officials to ensure compliance with basic health and safety regulations.

69. In March 2025, aware that construction at Delaney Hall was ongoing and that the owners did not possess the proper permits, municipal officials in the City of Newark attempted to inspect the property to ensure that the structure complied with all applicable municipal codes. *See* Pl.'s Br. Supp. O.S.C. ¶¶ 9–23, *City of Newark v. Geo Re-Entry Grp., LLC*, No. 2:25-cv-02225 (D.N.J. Apr. 11, 2025), Dkt. No. 15-4. They were turned away by Delaney Hall staff and were therefore unable to verify that the building's electrical work, plumbing, elevators, and food service

stations met minimal municipal standards. *Id.* The City of Newark subsequently filed suit in New Jersey state court on April 1, 2025. *Id.* ¶ 24.

70. On May 25, 2026, during the detainee hunger strike, New Jersey Governor Mikie Sherrill arrived at Delaney Hall to observe the facility, but she was denied entry. *See* Winnie Hu & Nate Schweber, *Gov. Sherrill Demands Access to ICE Facility as Hunger Strike Widens*, N.Y. TIMES (May 25, 2026), https://www.nytimes.com/2026/05/25/nyregion/sherrill-ice-delaney-hunger-strike.html.

71. On May 28, 2026, inspectors from the New Jersey Department of Health were denied access to Delaney Hall's medical unit, sleeping areas, and bathing and toileting facilities. *See* Pls.' Reply Br. at 7, 44, *Washington v. GEO Grp., Inc.*, No. 2:26-cv-6466 (D.N.J. 2026), Dkt. No. 14.

72. On June 1, 2026, State inspectors returned to review and inspect Delaney Hall's infection-control practices, but they were denied access. *Id.* at 8–9. The State's Department of Health then filed a lawsuit, still pending in the District of New Jersey, to obtain access to the facility. *See id.* at 9.

73. On June 8, 2026, New Jersey Governor Mikie Sherrill was denied the opportunity to conduct a full tour of Delaney Hall. Governor Sherrill described the tour she was given as "closely controlled and limited," and she stated that "she was not permitted to meet with or speak directly with detainees." Ana Ley & Mark Bonamo, *Governor's Visit to ICE Detention Facility Is Strictly Limited, She Says*, N.Y. TIMES (June 8, 2026), https://www.nytimes.com/2026/06/08/nyregion/sherrill-nj-delaney-hall.html.

**C. The Attorney General And DCR's Civil Rights Investigation**

74. On August 7, 2026, "in the wake of reports of alarming conditions and recent deaths," Plaintiffs announced that they were opening an investigation into whether GEO Group

had "violated the civil rights of people detained at the facility." Press Release, N.J. Off. of the Att'y Gen., *Attorney General Davenport Announces Civil Rights Investigation into Practices at Delaney Hall* (Aug. 7, 2026), https://www.njoag.gov/attorney-general-davenport-announces-civil-rights-investigation-into-practices-at-delaney-hall/. Plaintiffs informed the public that anyone "with information relevant to this civil rights investigation" could contact DCR at a designated email address. *Id.*

75. That same day, Plaintiffs sent GEO Group a letter request for information and accompanying subpoena (attached hereto as **Exhibit A** and **Exhibit B**, respectively) seeking "the production of information, documents, and tangible items relating to GEO's practices in connection with providing care for Delaney Hall detainees who have underlying medical conditions at the time of admission" as part of an investigation "into potential violations of substantive due process or equal protection rights, as well as violations of the [LAD]." Ex. A at 1. Plaintiffs specifically noted the constitutional right to adequate medical care for people in custody at Delaney Hall. *Id.* at 3; *see also supra* ¶ 37.

76. The August 7 letter highlighted that three detainees "who were allegedly suffering from underlying, untreated, or inadequately-treated medical conditions" had died while in custody, and that two of them had died after being transported to University Hospital. *Id.* at 2.

77. The August 7 letter also explained that, while Plaintiffs do not believe DHS's *Touhy* regulations bar GEO Group from complying with the state subpoena, their letter served in the alternative as a formal request for information pursuant to those regulations. *Id.* at 1.

78. The accompanying subpoena, issued to GEO Group pursuant to N.J. Stat. Ann. §§ 10:5-8 and 10:5-8.2, included document requests and interrogatories (collectively, "Information Requests") regarding, among other things, Delaney Hall detainees' medical records

and other documents relating to their health care, screening, and treatment; GEO Group's policies concerning the provision of health care, initial screening for detainees, and the treatment of detainees; Delaney Hall health care providers' professional qualifications, licensure, and training; GEO Group's plans for the mitigation of communicable diseases; and any documented instances of force used by Delaney Hall staff against detainees. *See* Ex. B.

79. The subpoena directed GEO Group to respond to the Information Requests by August 21, 2026. *Id.* at 1. Plaintiffs also instructed GEO Group to preserve any and all potentially responsive documents. Ex. A at 4.

80. On August 21, 2026, counsel for GEO Group sent Plaintiffs a four-sentence letter, asserting that all the requested documents were "federal records" and thus subject to the DHS's *Touhy* regulations. **Exhibit C** at 1. GEO Group claimed it was "declin[ing] service of the subpoena" and "direct[ed]" Plaintiffs "to review 6 C.F.R. pt. 5, subpt. C, §§ 5.41–5.49," DHS's *Touhy* regulations. *Id.*

81. On August 27, 2026, Plaintiffs responded to GEO Group's counsel. The August 27 letter noted that GEO Group did "not contest that the State effectuated valid service of the Subpoena on GEO by personal delivery to GEO's registered agent for service of process." It stated that Plaintiffs' August 7, 2026 letter request and accompanying subpoena already constituted a request pursuant to DHS's *Touhy* regulations, to the extent they applied—as the August 7 letter itself had expressly stated. The August 27 letter further explained that at least some of the information in GEO Group's possession that is responsive to the Information Requests—such as the total number of people detained at Delaney Hall, the identities of the people who provide health care services at Delaney Hall and whether those people are licensed in New Jersey, and the

languages spoken by people detained at Delaney Hall—could not be subject to DHS's *Touhy* regulations even under GEO Group's theory. **Exhibit D** at 1–3.

82. The August 27 letter also requested that GEO Group meet and confer with Plaintiffs given that the company had missed the August 21, 2026 deadline; that GEO Group confirm that the company was preserving all information and documents related to the Information Requests; and that GEO Group confirm that the company had immediately forwarded Plaintiffs' *Touhy* request to DHS as required by 6 C.F.R. § 5.43(b). *Id.* at 3.

83. Plaintiffs requested that GEO Group respond by September 1, 2026 to schedule a time for a meet and confer. *Id.*

84. On September 3, 2026, two days after the State's requested deadline, GEO Group's counsel sent a letter to Plaintiffs reiterating its view that, because GEO Group is a DHS contractor, the company "is not the proper party for this subpoena." **Exhibit E** at 1. The letter went on to accuse Plaintiffs' investigation as being part "of a larger provocation initiated by the State of New Jersey." *Id.* at 1. But GEO Group conspicuously did not contest the facts that had prompted Plaintiffs to initiate their investigation in the first instance.

85. In its September 3 letter, GEO Group again asserted that Plaintiffs' Information Requests in their entirety were subject to DHS's *Touhy* regulations because documents and information were "generated during the performance of work under the ICE contract." *Id.* at 2 (citation modified).

86. In its September 3 letter, GEO also confirmed that it had "complied with its obligations under 6 C.F.R. § 5.43" and stated that it would "preserve all information and documents in its possession, custody, and control." *Id.* at 2–3.

87. Notably, 6 C.F.R. § 5.43(b) requires DHS employees who are in receipt of a subpoena to "immediately forward a copy of that document to the Office of the General Counsel." Thus, per GEO Group's September 3, 2026 statement that it had "complied" with this obligation, Defendants likely received Plaintiffs' Information Requests on or around August 7, 2026.

88. Given GEO Group's representations, Plaintiffs anticipated a prompt response from the DHS General Counsel as to whether the agency would authorize a response to the Information Requests. But by late September, approximately two months after Plaintiffs issued the subpoena to GEO Group, Defendants still had not responded.

89. On September 29, 2026, Plaintiffs sent a letter to Defendants attaching the August 7, 2026 letter request and accompanying subpoena and reiterating that, while they did not believe GEO Group needed to comply with the DHS *Touhy* regulations to comply with the subpoena, Plaintiffs understood that GEO Group and DHS had been treating the Information Requests as covered by the *Touhy* regulations. **Exhibit F** at 1–2. The September 29 letter therefore asked Defendants to confirm that GEO Group forwarded the letter and Information Requests as required by 6 C.F.R. § 5.43—and if so, to indicate when Defendants received the Information Requests. The letter also asked DHS to communicate the current status of its decision-making process, including when Plaintiffs could expect an answer as to their requests. *Id.* at 2.

90. The September 29 letter stated that, "given the nature and exigent circumstances of the State's investigation," Plaintiffs were requesting a response by October 7, 2026. *Id.*

91. Plaintiffs received no response by October 7, 2026.

92. On October 20, 2026, Plaintiffs sent Defendants another letter, reiterating their Information Requests and seeking a response to the requests that had first been sent to GEO Group (and then forwarded to Defendants) on August 7, 2026. *See* **Exhibit G**.

93. The October 20 letter noted that Plaintiffs had fully complied with the requirements of "DHS's *Touhy* request procedure": Plaintiffs' August 7, 2026 letter had set forth the relevant factual background, identified with specificity the information and documents sought, and explained the relevance and significance of the requests to the ongoing investigation. *Id.* at 1; *see* 6 C.F.R. § 5.45(a).

94. The October 20 letter also reiterated that Plaintiffs had explained that the requests were "time sensitive," considering the recent deaths of three Delaney Hall detainees as well as concerns regarding GEO Group's "ongoing failure to provide adequate medical care to detainees within the facility and the potential infringement on their rights." Ex. G at 1–2. The letter underscored that Defendants' "refusal to respond" was prolonging the investigation and that the harm from this delay was "significant, potentially increasing the exposure of Delaney Hall detainees to continuing and serious harms to health and welfare." *Id.* at 2.

95. To facilitate DHS's consideration of the requests, and to further emphasize their time-sensitive nature, Plaintiffs provided "additional information in support of the request" that included information based on evidence collected during the "ongoing investigation of conditions at Delaney Hall, including witness statements, medical records, and other documents." *Id.* The evidence shared with DHS included numerous reports of deficiencies in GEO's provision of medical care to detainees, reports of GEO failing to protect detainees from physical harm, and evidence indicating both the denial of reasonable accommodations to individuals with disabilities and the denial of language interpretation services to detainees. *See supra* ¶¶ 64–67.

96. Based on the evidence developed by DCR, the need for a prompt response, and the ongoing threat to "the health and safety of detainees at Delaney Hall in violation of the law,"

Plaintiffs requested that Defendants "authorize GEO to produce the information sought by DCR's August 7 subpoena by no later than November 5, 2026." Ex. G at 3.

97. Defendants did not respond by November 5, 2026.

98. As of the filing of this Complaint, Plaintiffs have received no response from Defendants.

99. As of the filing of this Complaint, Defendants have had Plaintiffs' Information Requests for more than three months. Despite multiple follow-up inquiries and additional information provided by Plaintiffs in support of the requests, Defendants have failed to communicate any decision as to whether GEO Group can produce responsive information. In the absence of a decision, Plaintiffs cannot conduct their civil-rights investigation in the manner and on the timeframe warranted by the serious allegations and reports regarding GEO Group's operation of Delaney Hall.

## CAUSE OF ACTION

### Violation of the Administrative Procedure Act
### Agency Action Unlawfully Withheld or Unreasonably Delayed

100. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

101. The APA authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

102. An agency's decision on a request for information under its *Touhy* regulations is an "agency action" subject to APA review. *See Hou. Bus. J.*, 86 F.3d at 1212.

103. On information and belief, Defendants have unlawfully withheld and unreasonably delayed making their decision on whether to comply with Plaintiffs' Information Requests and notifying GEO Group of that decision.

104. DHS's *Touhy* regulations require Defendants to "decid[e] whether to comply" with Plaintiffs' Information Requests and—even assuming for sake of argument that GEO Group is a Department "employee"—to "notify" it "of [Defendants'] decision regarding compliance with the request or demand." 6 C.F.R. §§ 5.45(c), 5.48.

105. As of the filing of this Complaint, it has been more than three months since Plaintiffs first served their letter request for information and accompanying subpoena on GEO Group. That letter request expressly noted that, in the event GEO Group asserted that DHS's *Touhy* regulations applied, the request was submitted in accordance with DHS's *Touhy* regulations in the alternative. Because GEO Group took the position that the subpoena was covered by DHS's *Touhy* regulations, it was required to "immediately" forward the subpoena to DHS—which GEO Group subsequently confirmed it did.

106. Neither Defendants nor GEO Group responded to Plaintiffs' Information Requests by the August 21 deadline set forth in the letter request and subpoena. Nor did they respond by either the October 7 or November 5 dates by which Plaintiffs sought a response in their subsequent follow-up communications. Three months after service of the subpoena, Defendants' failure to state whether they will or will not respond is plainly unreasonable.

107. Several of the factors set forth in *Telecommunications Research & Action Center v. FCC (TRAC)*, 750 F.2d 70 (D.C. Cir. 1984), confirm that Defendants have unreasonably delayed making a decision on Plaintiffs' Information Requests.

108. First, Defendants' failure to make a decision plainly does not satisfy the "rule of reason" that governs the timeliness of such decisions. *Id.* at 80. This past year, ICE responded to a similar request for information regarding conditions at an immigration detention facility within a month. *See* Compl. ¶¶ 59–62, *Maryland v. Lyons*, No. 1:26-cv-01024 (D. Md. Mar. 10, 2026), Dkt.

No. 1 (indicating that Maryland sent a subpoena and *Touhy* request to DHS and ICE on January 30, 2026, and ICE sent a substantive response on February 25, 2026). Yet Defendants here have failed to communicate any timeline to Plaintiffs at all for over three months—despite Plaintiffs' communications laying out the urgency of their requests.

109. Second, given the limited burden that the request places on Defendants—to simply state whether they will or will not authorize production from GEO Group of material responsive to the Information Requests—it cannot meaningfully detract from "competing priorit[ies]." *TRAC*, 750 F.2d at 80. That is especially true considering Defendants' substantial financial resources, including a recent infusion of $85 billion dollars for purposes of immigration enforcement. *See* Bill Chappell, *How ICE grew to be the highest-funded U.S. law enforcement agency*, NPR (Jan. 21, 2026, at 5:00 AM ET), https://www.npr.org/2026/01/21/nx-s1-5674887/ice-budget-funding-congress-trump.

110. Third, Defendants' delay is particularly unreasonable because "human health and welfare are at stake." *TRAC*, 750 F.2d at 80. For well over a year, Delaney Hall detainees have spoken out about the spread of disease, lack of medical care, and abhorrent living conditions caused by GEO Group. *See supra* ¶¶ 48–59. And the three fatalities within Delaney Hall are allegedly linked to the company's failure to provide adequate health care. *See supra* ¶¶ 3, 51, 62–63. Through their ongoing investigation, Plaintiffs are aware of numerous serious reports and concerns regarding the inadequate provision of medical care to detainees, the failure to protect detainees from physical harm, and other asserted violations of law. *See supra* ¶¶ 64–66; *see also supra* ¶ 37. If State officials are unable to ensure that detainees' civil rights are upheld, additional detainees are likely to suffer serious harms to their health and welfare. And access to GEO Group's records concerning their implementation of various policies, including the provision of healthcare,

use of force, handling of sexual assault, and language access, is necessary for Plaintiffs to ensure compliance with applicable state and local laws. For the same reason, the "nature and extent of the interests prejudiced by delay" supports the conclusion that Defendants have unreasonably delayed action. *TRAC*, 750 F.2d at 80.

111. Fourth, Defendants' unreasonable delay in making a decision on a simple request for document disclosure serves no justifiable purpose and appears only to serve to hamper an investigation into the conditions at Delaney Hall. *See id.*; *see also*, *e.g.*, *United States v. California*, 921 F.3d 865, 885 (9th Cir. 2019) ("[M]ere collection of … factual data does not (and cannot) disturb any federal arrest or detention decision."). Indeed, stonewalling has been virtually the only response received by Plaintiffs and other state and local government officials working to ensure the safety of New Jersey residents at this privately-owned property operated by a private corporation within New Jersey's borders. *See supra* ¶¶ 68–73, 80, 84–88, 90–91, 96–99.

112. Defendants' unreasonable delay in making a decision on Plaintiffs' Information Requests has caused and will cause severe harm to Plaintiffs and their residents, undermining the State's enforcement of the law and threatening the health and welfare of New Jersey residents.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs request that the Court:

(a) Declare that Defendants have unlawfully withheld and unreasonably delayed responding to Plaintiffs' Information Requests under 5 U.S.C. § 706(1);

(b) Compel Defendants to notify GEO Group and Plaintiffs of Defendants' decision regarding compliance with the Information Requests within 7 days;

(c) Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

(d) Award such additional relief as this Court may deem just and proper.

November 17, 2026

Respectfully submitted,

**JENNIFER DAVENPORT**
ATTORNEY GENERAL OF NEW JERSEY

By: /s/ Mayur P. Saxena
Sundeep Iyer
D.D.C. ID: 1562696
*Solicitor General*
Shankar Duraiswamy
D.D.C. ID: 501702
*Deputy Solicitor General*
Mayur P. Saxena**
*Assistant Attorney General*
Isabelle C. Charo**
Bassam Gergi*
Joshua Gillerman*
Michelle J. Kostyack**
Jake Mazeitis*
*Deputy Attorneys General*
New Jersey Office of Attorney General
25 Market Street, P.O. Box 093
Trenton, NJ 08625-0093
(609) 376-2745
mayur.saxena@law.njoag.gov

*Attorneys for Plaintiffs*

* Loc. Civ. R. 83.2(e) certification forthcoming

** Appearing pursuant to Loc. Civ. R. 83.2(e)